UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER GALLI, individually and on behalf of others similarly situated,

Plaintiff,

v.

DEMANDSCIENCE US, LLC,

Defendant.

Civil No. 25-13683-LTS

MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 13)

August 17, 2026

SOROKIN, J.

This is a putative class action alleging violations of Colorado's Prevention of Telemarketing Fraud Act ("PTFA") against DemandScience US, LLC. Christopher Galli, on behalf of all others similarly situated, alleges that DemandScience published an online directory listing the cell phone numbers of Colorado residents without their consent. DemandScience moves to dismiss the amended complaint under Rule 12(b)(6). Doc. No. 13.[1] For the reasons that follow, the motion to dismiss is DENIED.

I. BACKGROUND

A. The PTFA

The following facts are drawn from the amended complaint. On May 27, 2005, Colorado Governor Bill Owens signed into law HB05-1288, which amended the PTFA to include Section

[1] Citations to "Doc. No. __ at __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

304(4)(a)(I). Doc. No. 21 ¶ 1. That section provides:

> On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly . . . [l]ists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing.

Colo. Rev. Stat. § 304(4)(a)(I).

The Colorado General Assembly enacted this section of the PTFA to address privacy concerns and to protect cell phone users from the misappropriation of their personal information. Doc. No. 21 ¶ 4. As explained in the statutory provision's "legislative declaration" statement:

> The general assembly hereby finds, determines, and declares that the use of telephones for commercial solicitation is rapidly increasing; that this form of communication offers unique benefits, but entails special risks and poses the potential for abuse; that the general assembly finds that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest; and, therefore, that the general welfare of the public and the protection of the integrity of the telemarketing industry requires statutory regulation of the commercial use of telephones.

Colo. Rev. Stat. § 6-1-301.

B. DemandScience

DemandScience is a Massachusetts-based, business-to-business ("B2B") data broker company. Doc. No. 21 ¶¶ 11, 15-16. It compiles and maintains a directory on its website (demandscience.com) for businesses seeking to acquire marketing and sales leads. Id. ¶¶ 16-18. At issue in this matter is DemandScience's publication of Colorado residents' cell phone numbers in its directory. DemandScience's website allows any user to search for individuals in the directory by name, job title, company, location, and other parameters. Id. ¶ 19. From the resulting list of individuals, the user can click on a specific individual to view a redacted preview of the individual's contact information. Id. ¶ 20. The user can then access the individual's unredacted cell phone number by clicking "Show Info" and paying a fee. Id.

Galli, a resident of Colorado, alleges that DemandScience lists and sells his cell phone number (and the numbers of other Coloradans) in this manner without consent. Id. ¶¶ 10, 22-23. He further argues that DemandScience's conduct has caused harm in various ways. First, he contends that "Defendant's misappropriation of Coloradans' cell phone numbers undeniably deprives Colorado residents of the ability to enjoy their PTFA privacy rights" and "deprives them of the real, quantifiable value of such data." Id. ¶ 27. He also argues that DemandScience's disclosure of cell phone numbers harms individuals by making them more susceptible targets to cybercriminals and fraudulent telemarketers. Id. ¶¶ 28-31.

Galli initially filed suit in state court on September 29, 2025. Doc. No. 1-1. DemandScience subsequently removed the case to this Court. Doc. No. 1. On January 12, 2026, DemandScience moved to dismiss. Doc. No. 13. A few weeks later, Galli filed an amended complaint, which advances one claim under Section 304(4)(a)(I) of the PTFA. Doc. No. 21. In light of the amended complaint, the Court asked DemandScience whether it wished to rely on the existing motion to dismiss or file a new response. Doc. No. 22. DemandScience chose the former route. Doc. No. 23. Galli then opposed the motion, Doc. No. 31, and DemandScience replied, Doc. No. 35. On May 20, 2026, the Court, pursuant to 28 U.S.C. § 2403(b), invited the Attorney General of Colorado to intervene in response to DemandScience's constitutional challenges to the PTFA. Doc. No. 37. The Attorney General did not intervene within the sixty-day timeline set by the Court or at any point thereafter. The Court held a hearing on the motion on July 29, 2026.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

(2007)). The court must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007). But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion." Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

## III. DISCUSSION

DemandScience moves to dismiss the amended complaint on several grounds. First, it contends that Section 304(4)(a)(I) does not apply here because (1) the PTFA only applies to entities engaged in telemarketing; and (2) DemandScience falls under the PTFA's publisher exemption. Second, DemandScience argues that the amended complaint should be dismissed because Section 304(4)(a)(I) poses an unconstitutional restriction of speech. Finally, DemandScience asserts that Section 304(4)(a)(I) is unconstitutionally vague. The Court addresses these arguments in turn.

### A. The PTFA's Application to DemandScience

DemandScience first argues that it cannot be held liable under Section 304(4)(a)(I) because that statutory provision "does not apply to businesses that neither engage in nor facilitate commercial telemarketing." Doc. No. 14 at 10. It bases this theory on two grounds. First, DemandScience points to the fact that the statute's legislative declaration indicates the PTFA was enacted to address the "rapidly increasing" use of telephones for "commercial solicitation" and "the widespread practice of fraudulent and deceptive commercial telephone solicitation." Id. Second, DemandScience contends that the word "commercial" in Section 304(4)(a)(I) should be understood as referencing commercial telephone solicitations or telephone sellers based on the way other provisions of the statute use the word. Id.

The Court is not persuaded by either theory. Notwithstanding the legislative declaration's focus on telephone solicitations, nothing in Section 304(4)(a)(I) limits liability to those engaging in or facilitating commercial telemarketing. Section 304(4)(a)(I) applies broadly to "a person" who "[l]ists a cellular telephone number in a directory for a commercial purpose" without consent. Colo. Rev. Stat. § 6-1-304(4)(a)(I). The statute further defines a "person" as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Id. § 6-1-102(6). Pursuant to this unambiguous definition, DemandScience clearly qualifies as a "person" under Section 304(4)(a)(I). Its argument that the PTFA narrowly governs entities involved in telemarketing runs counter to the plain language of the statute. "Courts may not interpolate into a statute words that it does not contain, or extract a meaning which is not expressed by it." Tatum v. Basin Res., Inc., 141 P.3d 863, 871 (Colo. App. 2005). "If the statutory language is clear," courts must "interpret the statute according to its plain and ordinary meaning." Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 397 (Colo. 2010); see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (citation modified)).

Similarly, DemandScience's far-fetched reading of the word "commercial" is not grounded in the language of the statute. It argues that other provisions of the PTFA "consistently use[] the word 'commercial' to describe a category of telephone solicitations or telephone seller." Doc. No. 14 at 10. This argument distorts the fact that those other provisions qualify the term "commercial" with more specific descriptors. See Colo. Rev. Stat. § 6-1-301 ("telephones for commercial solicitation," "fraudulent and deceptive commercial telephone solicitation," and

"commercial use of telephones"); id. § 6-1-302 ("commercial telephone solicitation" and "commercial telephone seller"); id. § 6-1-303 ("commercial telephone seller"); id. § 6-1-304(1) ("commercial telephone seller" and "commercial telephone solicitation"); id. § 6-1-305 ("commercial telephone seller"). Here, Section 304(4)(a)(I) prohibits listing "a cellular telephone number in a directory for a commercial purpose" without any limiting condition on the term "commercial." Id. § 6-1-304(4)(a)(I). Under its ordinary meaning, the phrase "commercial purpose" in Section 304(4)(a)(I) refers to a profit-related purpose. See Commercial, Black's Law Dictionary (12th ed. 2024) (defining "commercial" as "[o]f, relating to, or involving the selling of goods or services for profit"). And here, the amended complaint alleges that DemandScience published the cell phone numbers for a profit-motivated purpose—namely, "to entice demandscience.com users to pay to acquire access to demandscience.com subscriptions and/or credits" and "to fulfill Defendant's obligations to demandscience.com users who have paid for demandscience.com subscriptions and/or credits." Doc. No. 21 ¶ 46. Therefore, DemandScience's alleged actions plainly constitute the type of conduct prohibited by the statute.

DemandScience does not stop there. It further argues that it is exempt from the PTFA because it qualifies as a "publisher" within the statute's exclusion. Doc. No. 14 at 11. Not so. The PTFA states that it does not apply to "[p]ublishers, including outdoor advertising media, advertising agencies, broadcasters, or printers engaged in the dissemination of information or reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." Colo. Rev. Stat. § 6-1-106(1)(b). The Court notes as an initial matter that this exclusion's focus on information of a "deceptive character" appears to be more applicable to other provisions of the PTFA dealing with deceptive trade practices. See, e.g., id. § 6-1-105. In any event, DemandScience has not adequately demonstrated that it

amounts to a "publisher" under the exemption. As alleged in the amended complaint, DemandScience is the original creator and author of an online directory that allegedly violates Section 304(4)(a)(I). Doc. No. 21 ¶¶ 15-21. These allegations do not describe a non-culpable publisher that unknowingly disseminates prohibited information created and provided by others.[2]

Furthermore, DemandScience's broad interpretation of the publisher exemption would effectively swallow Section 304(4)(a)(I). As Galli argues, if a person could avoid liability under Section 304(4)(a)(I) so long as they "publish" or "engage[] in the dissemination of" the directory, then nearly all violators would be exempted. Doc. No. 31 at 10. For all these reasons, the Court rejects DemandScience's assertions that the statute does not reach its alleged conduct. With those issues resolved, the Court turns to DemandScience's constitutional challenges to Section 304(4)(a)(I).

B. First Amendment

1. *Content-Based Restriction*

DemandScience asserts that Section 304(4)(a)(I) facially violates the First Amendment because it is a content-based restriction on speech that does not survive strict scrutiny. "A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." City of Austin v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 69 (2022) (citation modified). To survive a facial challenge, content-based restrictions must satisfy strict scrutiny. McCullen v. Coakley, 573 U.S. 464, 478 (2014).

As a preliminary matter, Galli contends that Section 304(4)(a)(I) does not restrict "speech" because listing and selling cell phone numbers does not constitute expressive activity

[2] To provide an example, in the Court's view, the PTFA would exempt a printing company that assists in creating paper copies of DemandScience's directory.

protected under the First Amendment. Doc. No. 31 at 10-11. Instead, he characterizes the cell phone numbers as "pure 'fact[s]'" that "are only 'elements of speech.'" Id. at 11 (quoting Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 61-62 (2006)).

This argument deviates from Supreme Court precedent. In Sorrell, the Supreme Court rejected a similar argument with respect to a state law that prohibited pharmacies from selling records that revealed the prescribing practices of individual doctors. Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011). In finding that the creation and dissemination of the prescriber data amounted to speech within the meaning of the First Amendment, the Court emphasized that "[f]acts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." Id.

The same reasoning neatly applies to cases, such as this one, that involve laws restricting the disclosure of personal contact information. Indeed, other district courts have held that statutes restricting the disclosure of home addresses, phone numbers, and similar types of contact information regulate "speech" within the First Amendment's purview. See, e.g., Atlas Data Priv. Corp. v. We Inform, LLC, 758 F. Supp. 3d 322, 333-34 (D.N.J. 2024) (rejecting argument that state law limiting disclosure of law enforcement contact information "regulat[ed] only data" instead of "restricting speech"); Jackson v. Whitepages, Inc., 798 F. Supp. 3d 583, 594 (N.D. W. Va. 2025) (noting "lower courts consistently hold that factual disclosures of individuals' personal data . . . constitute speech" and listing cases). Following suit, this Court rejects Galli's contention that Section 304(4)(a)(I) regulates conduct falling outside the First Amendment's protective domain.

Having established that Section 304(4)(a)(I) regulates "speech" for the purposes of the First Amendment, the Court turns to whether it imposes a content-based restriction.

DemandScience argues that Section 304(4)(a)(I) is content based "because it restricts listing of a 'cellular telephone number' for 'commercial purposes' to the exclusion of all other information for any other purpose." Doc. No. 14 at 13. Galli responds that the statute's "ban on the commercial listing of cellular telephone number(s) (not a viewpoint in any way) belonging to any resident (rather than, say, only law enforcement officials) in a directory by anybody is content-neutral because it does not discriminate by subject matter or speaker." Doc. No. 31 at 13.

While the parties quibble about the applicability of various cases in great detail, the Court finds that Section 304(4)(a)(I) plainly amounts to a content-based restriction. The statute singles out a particular type of content—the disclosure of cell phone numbers for a commercial purpose. See Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 957 (9th Cir. 2012) (holding that city ordinance imposing limitations of the distribution of yellow pages phone directories "is a content-based restriction"). That the statute applies to any speaker who publishes a directory of any Colorado resident's cell phone number does not erase the fact that it restricts speech based on its content. Moreover, laws can amount to content-based restrictions even if they do not discriminate against speech based on the substantive ideas or viewpoints expressed. See Reed v. Town of Gilbert, 576 U.S. 155, 156 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." (citation modified)). For these reasons, the Court finds that Section 304(4)(a)(I) is a content-based restriction on speech.

2. *Applicable Standard of Review*

While content-based restrictions typically trigger strict scrutiny, this case presents additional analytical wrinkles. Galli argues that, "[e]ven if [Section 304(4)(a)(I)] were content-based," it is not subject to strict scrutiny for two reasons. Doc. No. 31 at 14. First, he asserts

that Section 304(4)(a)(I)'s resemblance to a traditional privacy tort allows it to "exist in harmony with the First Amendment" and "forecloses the application of strict scrutiny." Id. Second, he contends that intermediate scrutiny is the appropriate standard of review because Section 304(4)(a)(I) solely regulates commercial speech. Id. at 15. The Court evaluates each of these theories.

a. Privacy Tort

In support of his first theory, Galli relies on Vidal v. Elster, 602 U.S. 286 (2024). There, the Supreme Court found that the Lanham Act's name clause—which prohibits the registration of a trademark that includes the name of a living individual without that individual's consent—did not violate the First Amendment because the "tradition of restricting the trademarking of names has coexisted with the First Amendment, and the name clause fits within that tradition." Id. at 307. Galli contends that Section 304(4)(a)(I) is similarly compatible with the First Amendment because it is "closely related to three traditional privacy torts which have long existed in harmony with the First Amendment": (1) public disclosure of private information, (2) intrusion upon seclusion, and (3) misappropriation of name and likeness. Doc. No. 31 at 27.[3]

However, Galli cites no binding precedent establishing that a content-based restriction that bears some resemblance to privacy torts is subject to a less exacting standard of review. The Supreme Court cases he cites have limited holdings that do not readily support the theory he

[3] It is far from clear that the first two of these torts provide close analogs to Section 304(4)(a)(I). Public disclosure of private information and intrusion upon seclusion both require conduct that is highly offensive to a reasonable person. See Tonnessen v. Denv. Pub. Co., 5 P.3d 959, 966 (Colo. App. 2000); Pearson v. Kancilia, 70 P.3d 594, 599 (Colo. App. 2003). Listing phone numbers in a directory is a commonplace and longstanding practice (e.g., printed phone books) that a reasonable person likely would not view as highly offensive. Misappropriation of name and likeness presents a closer call. Nonetheless, even if Section 304(4)(a)(I) closely resembles such a tort, that fact alone is not sufficient for triggering a lower standard of review for the reasons explained in the text.

seeks to advance. For starters, the Supreme Court in Vidal cautioned that its decision was a "narrow" one that did not "set forth a comprehensive framework for judging whether all content-based but viewpoint-neutral trademark restrictions are constitutional." 602 U.S. at 310. Given its expressly narrow holding, Vidal contains no suggestion that its framework extends to a non-trademark-related privacy statute like the PTFA. Galli also cites Burson, a case involving a First Amendment challenge to a Tennessee statute prohibiting the solicitation of votes and the display of campaign materials within 100 feet of an entrance to a polling place. Burson v. Freeman, 504 U.S. 191, 198 (1992). There, the Supreme Court did not apply a lower standard of review and found that the Tennessee statute was a content-based regulation prompting strict scrutiny. Id. at 207. This case cuts against Galli's argument that strict scrutiny does not apply to Section 304(4)(a)(I).

Galli's reliance on Florida Star is similarly unavailing. That case involved a Florida statute making it unlawful to publish "in any instrument of mass communication" the name of the victim of a sexual offense. The Fla. Star v. B.J.F., 491 U.S. 524, 526 (1989). A newspaper brought a First Amendment challenge to the statute after being found civilly liable for publishing the name of a rape victim, which it had obtained from a publicly available police report. In evaluating this challenge, the Supreme Court did not expressly discuss whether strict scrutiny applied to the statute. Id. at 527. Instead, the Court relied upon a "limited First Amendment principle" that it identified from its precedents—namely, that "[i]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." Id. at 533. The Court then weighed three factors in evaluating the constitutionality of the Florida statute: (1) whether the newspaper lawfully obtained truthful

information about a matter of public significance, (2) whether the statute serves a need to further a state interest of the highest order, and (3) whether the statute actually serves those interests and is not underinclusive. Id. at 536-41. Upon assessing these factors, the Court found that the Florida statute violated the First Amendment.

The Supreme Court's holding in Florida Star does not support Galli's contention that Section 304(4)(a)(I) is entitled to a lower standard of review than strict scrutiny. For one, the subject matter and issues presented in this case widely diverge from the issues raised in Florida Star. The PTFA does not focus on newspapers, and the disclosure of cell phone information in a commercial directory implicates a completely different privacy concern than the mass publication of the names of sex-crime victims. Thus, it is doubtful that the "limited" First Amendment principle guiding Florida Star applies to this case.

But even assuming (without deciding) that Florida Star provides applicable guidance, nothing in that decision states or suggests that certain types of privacy protections should be reviewed under a more relaxed standard of review than strict scrutiny. To the contrary, the Northern District of West Virginia recently interpreted Florida Star as "only reinforc[ing] the conclusion that strict scrutiny applies," even though "the language of Florida Star differs from the standard strict scrutiny formulation." Jackson, 798 F. Supp. 3d at 599. This Court similarly declines to read Florida Star as paving a more forgiving standard of review for privacy statutes like the PTFA. See id. (emphasizing that Florida Star framework is "highly speech protective" and noting that "the Supreme Court has never used [the Florida Star] formulation to justify restricting the freedom to publish truthful information"). For all these reasons, the Court rejects the argument that Section 304(4)(a)(I)'s connection to privacy interests or torts insulates it from strict scrutiny.

b. Commercial Speech

Galli advances another theory for bypassing strict scrutiny. He contends that Section 304(4)(a)(I) only governs commercial speech, which triggers a lower standard of review—intermediate scrutiny. See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561-63 (1980) (noting that First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression").

Before weighing whether Section 304(4)(a)(I) governs commercial or non-commercial speech, the Court addresses the nature of DemandScience's First Amendment challenge. DemandScience brings a facial rather than an as-applied challenge to Section 304(4)(a)(I). In the First Amendment context, there are two ways for DemandScience to prevail on its facial attack. United States v. Stevens, 559 U.S. 460, 472-73 (2010). First, it can establish that "no set of circumstances exist under which [Section 304(4)(a)(I)] would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Alternatively, it can establish that the law is unconstitutionally overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Stevens, 559 U.S. at 473 (citation modified). "The overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." Virginia v. Hicks, 539 U.S. 113, 122 (2003) (citation modified). Because facial invalidation of a statute is a "wide-reaching" measure, courts employ the overbreadth doctrine "with hesitation" and "only as a last resort." New York v. Ferber, 458 U.S. 747, 769 (1982).

Despite framing its challenge to Section 304(4)(a)(I) as a facial one, DemandScience does nothing to engage with these standards governing its facial challenge. It does not argue that there are no circumstances under which Section 304(4)(a)(I) is compatible with the First

Amendment. Nor does it discuss "which of the law's applications are constitutionally permissible and which are not, and . . . weigh the one against the other." Moody v. NetChoice, LLC, 603 U.S. 707, 744 (2024). For example, DemandScience does not argue that Section 304(4)(a)(I)'s illegitimate applications to non-commercial speech are substantial in comparison to its potentially legitimate applications to commercial speech, such that it is susceptible to facial invalidation. Instead, in its rebuttal to Galli's argument that Section 304(4)(a)(I) governs commercial speech, DemandScience only discusses Section 304(4)(a)(I)'s application to its own alleged conduct. See Doc. No. 35 at 3-5.

Given DemandScience's focus on its own conduct, the Court follows its lead and evaluates whether Section 304(4)(a)(I)'s application to DemandScience constitutes a restriction on commercial speech—that is, "expression related solely to the economic interests of the speaker and its audience." Cent. Hudson, 447 U.S. at 561.[4] The Court finds that it does. As alleged in the complaint, DemandScience is a B2B data broker that sells personal contact information to businesses wishing to improve their marketing and sales efforts. Doc. No. 21 ¶¶ 15-17. Put simply, DemandScience's business is premised on getting its customers to pay to access individuals' cell phone numbers and other personal information. DemandScience does not provide cell phone numbers for free. It only discloses cell phone numbers as part of a commercial transaction with its customers.[5] Id. ¶ 20. Accordingly, DemandScience's disclosure

[4] The Court does so despite DemandScience's unequivocal assertion at the hearing that it brings a facial challenge to the statute. The papers read otherwise. In addition, a narrower review is preferable to a broader facial challenge, which is typically "disfavored" by courts. Moody, 603 U.S. at 744.

[5] This fact differentiates this matter from Dex Media, a Ninth Circuit case relied on by DemandScience. Dex Media involved a Seattle law imposing conditions on the distribution of yellow pages phone directories, such as requiring publishers of such directories to obtain permits and pay a fee for each directory distributed in the city. Dex Media, 696 F.3d at 953. There, the Ninth Circuit found that "advertisements contained in yellow pages directories fit within our core

of cell phone information "is—primarily, if not entirely—an economic act." Boelter v. Hearst Commc'ns, Inc., 192 F. Supp. 3d 427, 445 (S.D.N.Y. 2016).

DemandScience avers that its disclosure of cell phone numbers "provides factual information that users may employ for a wide range of purposes that are not limited to commerce," such as "for research, employment inquiries, customer service issues, or simply to contact a business." Doc. No. 35 at 4. But this does not change the fact that DemandScience's disclosure, itself, is intertwined within a commercial transaction between DemandScience and its customers. That a customer may then proceed to use the cell phone data for a non-commercial purpose does not nullify the commercial nature of DemandScience's speech.

DemandScience further contends that its directory cannot be seen as commercial speech because it does not satisfy the three-factor analysis employed by the Supreme Court in Bolger. At issue in Bolger were informational pamphlets distributed by a manufacturer of contraceptives promoting the desirability and availability of contraceptive products. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 62 (1983). In evaluating whether these pamphlets constitute commercial speech, the Court considered three factors—whether the speech is an advertisement, refers to a specific product or service, and is economically motivated. Id. at 66-67. The Court concluded that the "combination of *all* these characteristics . . . provides strong support for the . .

---

notion of commercial speech," whereas "telephone listings and community information contained in the directory constitute noncommercial speech." Id. at 957 (citation modified). Nonetheless, this holding does not establish that the paywalled cell phone listings on DemandScience's website constitute non-commercial speech. In Dex Media, the yellow pages phone directories were provided to customers "free of charge." Id. at 954. Therefore, the telephone listings contained in those directories were not the components of any commercial transaction. By contrast, DemandScience only discloses the cell phone numbers in its database in exchange for payment, which situates this speech within a commercial transaction.

. conclusion that the informational pamphlets are properly characterized as commercial speech." Id. at 67.

Relying on this decision, DemandScience contends that its database does not amount to commercial speech because it "satisfies, at most, the third *Bolger* factor." Doc. No. 35 at 4. But the three factors considered in Bolger do not impose a strict test for commercial speech. To the contrary, the Supreme Court made clear that it did not "mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." Bolger, 463 U.S. at 67 n.14. After Bolger, many district courts have concluded that the disclosure of personal information to third parties amounts to commercial speech without relying on Bolger's three-factor framework. See, e.g., Saunders v. Hearst Television, Inc., 711 F. Supp. 3d 24, 33 (D. Mass. 2024); Sutton v. TED Found., Inc., No. 23-cv-9219-DEH, 2026 WL 207000, at *10-11 (S.D.N.Y. Jan. 27, 2026); Stark v. Patreon, Inc., 656 F. Supp. 3d 1018, 1033-34 (N.D. Cal. 2023). Thus, nothing in Bolger precludes this Court from finding that DemandScience's profit-driven dissemination of cell phone information amounts to commercial speech.

In any event, DemandScience's disclosure of cell phone numbers to paying customers is not the type of speech that typically warrants a high level of protection under the First Amendment. This is because DemandScience's alleged conduct is "speech solely in the individual interest of the speaker and its specific business audience" and does not implicate matters of public concern, such that it "requires special protection to ensure that debate on public issues will be uninhibited, robust, and wide-open." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 762 (1985) (citation modified); see also Trans Union Corp. v. F.T.C., 245 F.3d 809, 818 (D.C. Cir. 2001) (finding that Trans Union's sale of consumer reports

listing names and addresses to marketers was speech "solely of interest to the company and its business customers" and applying intermediate scrutiny). Furthermore, where speech is "solely motivated by the desire for profit," that speech is propelled by a "force less likely to be deterred than others." Dun, 472 U.S. at 762. Based on all these considerations, the Court finds that DemandScience's alleged conduct amounts to commercial speech that is afforded "a lesser protection" than "other constitutionally guaranteed expression." Cent. Hudson, 447 U.S. at 563.

3. *Intermediate Scrutiny*

Having resolved that DemandScience's disclosures constitute commercial speech, the Court addresses whether Section 304(4)(a)(I)'s restriction on such disclosures survives intermediate scrutiny. If the commercial speech being regulated concerns lawful activity and is not misleading, as is the case here, the speech may be regulated if (1) the government has a "substantial interest" in restricting the speech, (2) the regulation "directly advances the governmental interest" involved, and (3) the regulation is "not more extensive than necessary to serve that interest." Id. at 566.

As for the first factor, Section 304(4)(a)(I) appears to advance two interests: preventing fraud and protecting privacy. The PTFA's legislative declaration explicitly points to fraud as the problem targeted by the statute, stating "that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly, homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest." Colo. Rev. Stat. § 6-1-301. Furthermore, as Galli contends, Section 304(4)(a)(I) is also "designed to protect privacy." Doc. No. 21 ¶ 2. As one sponsor of the law explained: "Most people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important." Id.

DemandScience does not dispute that Colorado's interests in preventing fraud and protecting the privacy of its residents are substantial. Indeed, such aims have been recognized by the Supreme Court as substantial governmental interests. See, e.g., Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 612 (2021) ("It goes without saying that there is a substantial governmental interest in protecting the public from fraud." (citation modified)); Fla. Bar v. Went For It, Inc., 515 U.S. 618, 625 (1995) (recognizing privacy as substantial state interest). Accordingly, the Court finds that Section 304(4)(a)(I) survives the first step of intermediate scrutiny review.

The next inquiry is whether Section 304(4)(a)(I) directly advances the governmental interest at issue. To satisfy this factor, the "governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995) (citation modified). A "commercial speech regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 505 (1996) (citation modified). Here, Section 304(4)(a)(I) directly advances one of its aims—protecting cell phone privacy. By prohibiting commercial directories from listing cell phone numbers without consent, Section 304(4)(a)(I) plainly enhances individuals' ability to keep their cell phone numbers private. Thus, the Court finds that Section 304(4)(a)(I) satisfies the second factor of the intermediate-scrutiny analysis without resolving whether it directly advances its other goal of preventing fraud.[6]

[6] The Court is less persuaded that Section 304(4)(a)(I) directly serves its aim of preventing fraud. While limiting the dissemination of cell phone numbers may make it more challenging for fraudsters to find and contact their victims, Section 304(4)(a)(I)'s restriction on directories targets conduct that is multiple degrees removed from the actual fraudulent activity. However,

This brings the Court to the final factor—whether Section 304(4)(a)(I) is not more extensive than necessary to serve Colorado's interest in protecting cell phone privacy. As the Supreme Court has explained, this factor requires that the regulation be a "reasonable fit" for accomplishing the government's interest. Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989). DemandScience contends that Section 304(4)(a)(I) fails to meet this bar because it is "both underinclusive and overinclusive." Doc. No. 35 at 5. In particular, it argues that the statutory provision "bans the truthful publication of phone numbers even where individuals have voluntarily disclosed them or where no telemarketing occurs," while simultaneously "leav[ing] untouched numerous disclosures that pose equal or greater privacy risks, including government publications, voluntary disclosures on social media, and noncommercial databases." Id.

As an initial matter, Section 304(4)(a)(I)'s underinclusiveness does not render it unconstitutional. A law does not fail intermediate scrutiny merely because it does not address the entirety of the issue that the government seeks to resolve. The First Amendment "imposes no freestanding underinclusiveness limitation, and the Government need not address all aspects of a problem in one fell swoop." TikTok Inc. v. Garland, 604 U.S. 56, 76 (2025) (citation modified). And here, Colorado may have had a legitimate basis for limiting Section 304(4)(a)(I)'s reach to commercial, as opposed to non-commercial, directories. It is reasonable to conclude that directories used for a commercial purpose generate higher privacy risks because the creators of such directories are financially motivated to sell and disseminate the data on a widespread basis.

---

the Court need not resolve this issue in light of its conclusion that the statutory provision directly advances Colorado's interest in safeguarding privacy.

In light of these considerations, the Court declines to conclude that Section 304(4)(a)(I) is fatally underinclusive.

Overinclusiveness presents a closer call. As the Court sees it, the cell phone numbers disclosed in DemandScience's directory conceivably fall into three categories. First, there are the personal cell phone numbers of individuals that are only disclosed to family, friends, and select businesses or organizations with which the individuals interact. This category of cell phone numbers invokes a substantial privacy interest that DemandScience impairs through publishing its directory. Thus, Section 304(4)(a)(I)'s protection of this first category of cell phone numbers clearly aligns with Colorado's aim of safeguarding privacy.

Section 304(4)(a)(I)'s application to other types of phone numbers, however, stray further from this aim. Section 304(4)(a)(I) also covers a second category of phone numbers: personal cell phone numbers that are publicly available on other sources. For example, as DemandScience points out, Colorado's public voter registration records contain the cell phone numbers of certain individual voters. Doc. No. 14 at 17. Additionally, some individuals voluntarily disclose their cell phone numbers on public social media profiles. Doc. No. 35 at 5. DemandScience argues that Section 304(4)(a)(I) is overinclusive because it penalizes the disclosure of these types of publicly available numbers. Doc. No. 14 at 17.

The third category of phone numbers that Section 304(4)(a)(I) covers is public-facing cell phone numbers used for business purposes. A local plumber may publicize his cell phone number on his website for scheduling appointments. A lawyer may advertise her work cell phone number on billboards to attract clients. Preventing DemandScience from disseminating this category of cell phone numbers does little (if anything) to advance Colorado's interest in protecting the privacy of its residents.

Nonetheless, the Court finds that Section 304(4)(a)(I)'s reach into the second and third categories of phone numbers does not render it fatally overinclusive. Beginning with the second category, individuals with personal cell phone numbers that are already in the public domain still possess a legitimate privacy interest in preventing the further dissemination of their numbers on DemandScience's directory. As described on its own website, DemandScience "compiles and organizes" a directory that customers can use to "[f]ilter across millions of contacts . . . to select ideal customers." Doc. No. 21 ¶ 16. DemandScience advertises that its directory "makes marketing and sales easier by enabling organizations to find the right prospects faster and target in-market buyers." Id. In this manner, DemandScience operates and sells a compiled trove of personal data that is designed to be easily searchable.

This compilation of information generates greater privacy risks than the disclosure of personal information in other public sources. It is far easier to find personal data through a streamlined online directory than through government records and individual social media accounts. See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 764 (1989) (noting that "the compilation of otherwise hard-to-obtain information" in a "single clearinghouse of information" "alters the privacy interest implicated by disclosure of that information"). And, Section 304(4)(a)(I) specifically targets these concerns by narrowing its prohibition to the listing of cell phone numbers in a directory, rather than in one-off posts or publications.[7] Therefore, Section 304(4)(a)(I)'s application to personal cell phone numbers that are publicly disclosed still fits within the government's interest in protecting privacy.

[7] To the extent that some personal cell phone numbers in this second category are so widely disseminated that the privacy interest cannot sustain the application of the statute, such an issue would be more appropriately resolved with the benefit of a fuller factual record at a later stage of the case or through narrowing the class definition.

As for the third category, there is no indication that Galli seeks to represent users of business cell phones. The amended complaint focuses on DemandScience's disclosure of "personal" information and data. See Doc. No. 21 ¶¶ 10, 17, 36, 48. Indeed, Galli represents that he is a resident and citizen of Colorado whose "personal information" was listed by DemandScience without his consent. Id. ¶ 10. Accordingly, any concern of overinclusiveness raised by the third category of cell phone numbers is best resolved by narrowing the class definition to exclude owners of public-facing cell phone numbers used for business purposes.[8] This appropriately circumscribes the scope of Galli's PTFA claim without reaching thorny constitutional issues that need not be resolved in this case. See United States v. Vilches-Navarrete, 523 F.3d 1, 9 n.6 (1st Cir. 2008) ("The maxim that courts should not decide constitutional issues when this can be avoided is as old as the Rocky Mountains and embedded in our legal culture for about as long.").

In any event, intermediate scrutiny does not require the government to "employ the least restrictive means conceivable" in targeting an identified problem. Greater New Orleans Broad. Ass'n, Inc. v. United States, 527 U.S. 173, 188 (1999). Although it may not represent a "perfect" fit, Section 304(4)(a)(I) is sufficiently tailored to the government's aim of protecting the privacy of Colorado residents for all the reasons stated above. Id. Moreover, Section 304(4)(a)(I) does not impose an outright prohibition on speech. It allows DemandScience to continue operating its directory with the affirmative consent of those whose cell phone numbers are disclosed on the website. Colo. Rev. Stat. § 304(4)(a)(I). It also limits liability to those who knowingly commit the offense. Id. For all these reasons, the Court finds that Section

[8] Narrowing the class definition in this manner also eliminates any potential concern about Galli's ability to adequately represent this category of cell phone users.

304(4)(a)(I) survives intermediate scrutiny. DemandScience's motion to dismiss the complaint on the grounds that Section 304(4)(a)(I) violates the First Amendment is DENIED.

C. Vagueness

DemandScience further contends that Section 304(4)(a)(I) is impermissibly vague in violation of the Fourteenth Amendment of the U.S. Constitution and the Colorado Constitution's equivalent protections. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the . . . due process of law." Connally v. Gen. Const. Co., 269 U.S. 385, 391 (1926). At the same time, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989).

DemandScience insists that Section 304(4)(a)(I) is unconstitutionally vague because it does not define the terms "lists," "directory," and "commercial purpose." Doc. No. 14 at 19. The Court disagrees. While the PTFA does not define these terms, these words are far from the types of amorphous, subjective words courts deem impermissibly vague. For example, the Supreme Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." United States v. Williams, 553 U.S. 285, 306 (2008). By contrast, the words "lists," "directory," and "commercial purpose" have clear, ordinary definitions that do not "require similarly untethered, subjective judgments." Holder v. Humanitarian L. Project, 561 U.S. 1, 21 (2010).

In any event, a party "whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause . . . for lack of notice." Id. at 20. Here, DemandScience's alleged actions fit within the category of conduct that Section 304(4)(a)(I)

proscribes—namely, "list[ing] a cellular telephone in a directory for a commercial purpose" without consent. Colo. Rev. Stat. § 304(4)(a)(I). That is precisely what DemandScience is alleged to have done by creating a directory of individuals' cell phone numbers that it maintains behind a paywall.[9] And as explained above, DemandScience has not successfully shown that the PTFA does not apply to its conduct or that its alleged actions are exempt from the statute. Because "the statutory terms are clear in their application to" DemandScience's alleged conduct, its "vagueness challenge must fail." Holder, 561 U.S. at 21.

D. Class-Wide Statutory Damages

Finally, DemandScience "moves in the alternative to strike Plaintiff's prayer for class-wide statutory damages under Rule 12(f)." Doc. No. 14 at 19. Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, or scandalous matter." Fed. R. Civ. P. 12(f). DemandScience argues that because the PTFA "provides for limited statutory damages only for individual claims" and "says nothing about class relief," class-wide statutory damages are not available. Doc. No. 14 at 19 (citing Colo. Rev. Stat. § 6-1-305(1)(c)). To support this argument, DemandScience points to the fact that the broader Colorado Consumer Protection Act ("CCPA"), within which the PTFA is codified, has been interpreted by courts to bar class-wide statutory damages. Id. at 19-20.

The Court is not persuaded. The particular provision of the CCPA that has been found by courts to exclude class-wide statutory damages is Section 6-1-113, which explicitly provides for

[9] DemandScience argues that the statute "does not clearly indicate whether it applies to directories that generate revenue for the directory owner, as Plaintiff contends in this case, or if the cell phone numbers themselves must be used for a commercial purpose (e.g., to solicit a purchase from those individuals whose numbers are listed)." Doc. No. 14 at 18-19. But the latter interpretation tacks on an additional requirement that is unfounded in the plain language of the statute. Section 304(4)(a)(I) imposes liability on any person who lists a cell phone number in a directory for a commercial purpose; it does not require that the cell phone numbers are then used in a particular, commercial manner.

statutory damages "[e]xcept in a class action." Colo. Rev. Stat. § 6-1-113(2). That provision also specifies that "[i]n a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs"—leaving out any mention of statutory damages. Id. § 6-1-113(2.9). Thus, Section 6-1-113 expressly establishes that class actions cannot yield the same statutory damages permitted in individual cases.

The PTFA does not contain a similar restriction on class-wide statutory damages. Section 6-1-305(1), which sets out the penalties available for violations of Section 304(4)(a)(I), provides for statutory damages in the following manner:

> A person who engages in any unlawful telemarketing practice as defined in section 6-1-304 (4) shall be liable in a private civil action to the owner of the cellular telephone for consequential damages, court costs, attorney fees, and a penalty in the amount of at least three hundred dollars and not more than five hundred dollars for a first offense and at least five hundred dollars and not more than one thousand dollars for a second or subsequent offense.

Colo. Rev. Stat. § 6-1-305(1)(c). Unlike Section 6-1-113, Section 6-1-305(1) does not contain any language distinguishing or limiting the remedies available for class actions. Nor is there any indication that penalties under the PTFA are circumscribed by the penalties available under the CCPA. To the contrary, Section 6-1-305(1) states that its penalties are provided "[i]n addition to the remedies available under sections 6-1-110, 6-1-112, and 6-1-113." Colo. Rev. Stat. § 6-1-305(1) (emphasis added). Based on these considerations, the Court declines to interpret the PTFA as precluding class-wide statutory damages.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss, Doc. No. 13, is DENIED. The Clerk shall schedule a Rule 16 conference in this matter.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge